## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 24-CR-52 |
| ANNA LAYHER, | Hon. Patricia T. Giles |
| Defendant. | |

### <u>MEMORANDUM IN AID OF SENTENCING</u>

Anna Grace Layher comes before the Court for sentencing having admitted and accepted responsibility for her grievous misconduct.  Ms. Layher acknowledges the seriousness of her wrongdoing, recognizes the harm her actions have caused her children, and understands the Court is mandated to impose a lengthy sentence.  As harmful as Ms. Layher's conduct was, it must be viewed through the lens of her mental health profile, which contextualizes her susceptibility to manipulation and lies at the heart of her participation these abhorrent acts.  Given this backdrop, Ms. Layher, through counsel, submits that a sentence of 15 years in prison, followed by a period of supervised release, will satisfy the goals of sentencing in this case.

**I.      The Court must impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing, and the guideline range and mandatory minimum are only two of many factors the Court must consider.**

It is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The Court must keep in mind that, as the Department of Justice recently noted,

determining the Guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Gov't Supp. & Amend. Sent. Mem., *United States v. Stone*, Case No. 19-cr-18-ABJ, Dkt. No. No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors); *see also Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007),

As the Court explained in *Nelson*, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." 555 U.S. at 352. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth in 18 U.S.C. § 3553(a),[1] a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence

---

[1] These other factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the need to avoid unwarranted sentencing disparities, (4) the need for restitution, and (5) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005).

In this case, a mandatory minimum sentence applies to each count: the sentence on each must fall between 15 years and 30 years. 18 U.S.C. § 2251(e); ECF No. 26. But, like the guideline range, "the kinds of sentences available" is only one of many factors the Court must consider at sentencing, *see* § 3553(a)(4), and the Court should not presume that 15 years is "not greater than necessary" to accomplish the goals of sentencing because, ultimately, the central mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2). This requirement is not just another factor for the Court to consider along with the others set forth in § 3553(a). Rather, it sets an independent limit upon the sentence. Accordingly, the Court should determine the appropriate sentence in consideration of *all* of the factors in § 3553, and only adjust upward to satisfy the mandatory minimum as necessary to comply with the law.

## II.   The guidelines applicable to production cases are not the product of empirical data, national experience, or independent expertise, and courts regularly vary downward in such cases.

After *Gall* and *Kimbrough*, the fact that a guideline (or amendment to a guideline) was spawned by congressional action is a red flag for lack of empirical basis, raising the question whether the guideline reflects unsound judgment. *See Gall*, 128 S. Ct. at 594 n.2 ("For example, the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and

chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes."); *Kimbrough*, 128 S. Ct. at 575 ("The crack cocaine Guidelines . . . do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'").

That is exactly what occurred in the case of the production guidelines applicable here. The guideline base offense level is not based on careful and empirical study by the Sentencing Commission. Instead, it was contrived by the Commission to execute Congressional mandates. That is, the base offense level of 32 reflects not the Commission's view of what an appropriate base offense level should be after study, but, instead, Congress's decision to increase the mandatory minimum sentence for these offenses to 15 years, rather than 10 years, in the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, (the "PROTECT Act"), Pub. L. 108-21.[2]

Thus, as the applicable guideline range begins with a guideline that is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it can "yield[] a sentence 'greater than necessary' to achieve §3553(a)'s

---

[2] *See* Amendment 664 (2003) (noting that Commission increased § 2G1.2 base offense level from 27 to 32 because, "combined with the application of several specific offense characteristics that are expected to apply in almost all production cases (*e.g.*, age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met in by the Chapter Two calculations almost every case").

purposes . . ." *Kimbrough,* 128 S. Ct. at 575. Indeed, a guideline that does not "exemplify the Commission's exercise of its characteristic institutional role" is not entitled to deference. *Id.* at 575.

Furthermore, the guidelines for production do a poor job of distinguishing among offenders because there are several enhancements that apply in the majority of cases, rather than in outlier cases. For example, almost all such offenders will receive an enhancement of at least two points for the "age of the victim," given that all minors other than 17- and 18-year-olds trigger an upward enhancement pursuant to. § 2G2.1(b)(1).[3] Likewise, the "sex act or sexual contact" enhancement in § 2G2.1(b)(2) has consistently been applied in well over 50% of cases; it enhanced the guideline range in 70% of cases in FY 2019.[4] These enhancements for conduct that the evidence shows to be essentially standard-issue production added 4 levels to Ms. Layher's offense level as calculated in the PSR – leading to a higher guideline range.

Similarly, more than half of production offenders sentenced in FY 2019 "received enhanced penalties under § 4B1.5(b) for engaging in a pattern of activity

---

[3]   *See* U.S. Sent. Comm'n, "Federal Sentencing of Child Pornography Production Offenses" (Oct. 2021) [hereinafter "2021 Commission Production Report"] at 3, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf (last visited March 31, 2023) (showing that over 90% of § 2G2.1(b)(1) offenders received an enhancement due to age of the victim in FY 2019). *See also* Amendment 664 (2003) (noting that this is one of several "several specific offense characteristics that are expected to apply in almost all production cases").

[4]   *See id.* at 20.

involving prohibited sexual conduct."[5] This means that circumstances that exist in roughly one out of every two production cases have added 5 levels to the advisory guideline range contained in the PSR,[6] in addition to the 2-level grouping enhancement that Ms. Layher received based upon the number of counts to which she pleaded guilty.

Sentencing trends in production cases reflect that many courts agree that although these offenses are indisputably serious, the suggested guideline ranges in these cases are not helpful, or at least too high. Indeed, average sentences between Fiscal Years 2005 and 2019 were consistently lower than the average guideline range.[7] And the trend continues: in Fiscal Years 2021 and 2022, roughly 60% of child pornography production defendants received downward variances.[8]

---

[5] *Id.* at 19 (showing that § 4B1.5(b) was applied in 51.6% of cases in 2019); PSR ¶ 63.

[6] The inclusion of the pattern enhancement was not stipulated to by the parties.

[7] 2021 Commission Production Report at 3.

[8] U.S. Sent. Comm'n, "2021 Sourcebook of Federal Sentencing Statistics," Table 32 (showing that, of 523 offenders sentenced under USSG 2G2.1 in FY 2020, 29 received reductions for substantial-assistance or above-range sentences; 28 received other downward departures; of the remaining 440, only 186 cases resulted in within-range sentences, and 280 resulted in downward variances); U.S. Sent. Comm'n, "2022 Sourcebook of Federal Sentencing Statistics," Table 32 (showing that, of 746 offenders sentenced under U.S.S.G. § 2G2.1 in FY 2021, 41 received reductions for substantial assistance or above-range sentences; 28 received other downward departures; of the remaining 677, only 265 cases resulted in within-range sentences, and 412 resulted in downward variances). All Commission Sourcebooks are available at https://www.ussc.gov/research/sourcebook/archive (last visited August 29, 2024).

In these myriad ways, the sentencing guideline for production offenses fails to meaningfully differentiate among offenders in this type of case. By recommending the maximum sentence for Ms. Layher (and many similarly situated defendants), the guidelines provide the Court little guidance. Moreover, they effectively contradict the statutory mandate to impose the minimally sufficient sentence in each case necessary to accomplish the purposes of sentencing. For all of these reasons, this Court should give little weight to the advisory sentencing range.

**III.   A sentence of 15 years followed by a period of supervised release is sufficient to achieve the goals of sentencing.**

The balance of the factors in § 3553 support the conclusion that a sentence of 15 years followed by a period of supervised release will be sufficient but not greater than necessary to achieve the goals of sentencing in this case.

   A. *The proposed sentence would reflect Ms. Layher's history and characteristics.*

   1. <u>Ms. Layher began life with organic deficits and attachment issues, which were evident at a very young age.</u>



███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████    ████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

2. <u>Ms. Layher's teenage years were marked by rebellion and resistance, which is not uncommon for a teenager, but was more pronounced, given her functioning deficits</u>.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



with therapy to seek support for postpartum depression and stress

3. A current psychiatric evaluation provides a full analysis of the factors that have influenced Ms. Layher's prevailing mental health symptoms

throughout her life, and outlines a treatment plan individualized for Ms. Layher's unique presenting problems.



---

⁹ *See* Massachusetts Institute of Technology [hereinafter "MIT"], Young Adult Development Project, available at https://hr.mit.edu/static/worklife/youngadult/brain.html. MIT started the project in 2005 to analyze, distill, and disseminate key findings about young adults' development. As reflected in the project's findings, "According to recent findings, the human brain does not reach full maturity until at least the mid-20s. . . . The specific changes that follow young adulthood are not yet well studied, but it is known that they involve increased myelination and continued adding and pruning of neurons." *Id.*

████████████████████████████  ████████████████████

███

      *4.* <u>Ms. Layher has begun the hard work on the road to redemption, including self-reflection and a commitment to understanding her behaviors and how to treat them.</u>

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████  ██  ████

█████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████  ████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

B. *The proposed sentence would reflect the nature and circumstances of the offense.*

Ms. Layher has pleaded guilty and accepted responsibility for her grievous conduct. More than once, Ms. Layher made the decision to have sexual contact with her children, documented these contacts on her phone, and sent them to her on-again off-again boyfriend, Davey Sisk – all at his insistence. The nature of the offense is indisputably serious and inarguably abhorrent. Indeed, Ms. Layher is disgusted with herself and has attempted to express her remorse, acknowledging that there were no words to express "the deep hurt and regret [she] has". Rich Report at 4; Letter from Anna Layher. However, Ms. Layher did not think of, nor plan the offenses in which she engaged, and given her mental health background, was unusually vulnerable to manipulation.

As awful as Ms. Layher's conduct was, she did not spearhead the production of images. Mr. Sisk insistently and incessantly requested the abhorrent images. Without fail, he preyed on his understanding of Ms. Layher's unhealthy attachment to him in making his demands – alternating between threatening to withhold his affection (upon which she placed inordinate value) and threatening to ruin her life.[10]

---

[10] Review of discovery provided by the Government reveal Telegram messages illustrative of this point including, but not limited to, the following:

Ms. Layher's susceptibility to manipulation is unsurprising given her mental health diagnoses, particularly her attachment issues and fear of abandonment. Rich Report at 15. To be sure, Dr. Rich opines that "her adoption journey, attachment issues, and parent-child relational issues contributed to her low self-esteem, magnified her social anxiety, and led to a longing for validation from others." *Id.* As it relates to her relationship with Mr. Sisk, Dr. Rich explains, "the fear of losing Davey and her lack of emotional boundaries with him contributed to [Ms. Layher] 'fawning' to his every whim."[11]   Rich Report at 16.

| Layher Telegram Messages | **Layher:** I'm not doing that too her you see how f***** up it has made me. **Sisk:** Then I'll show everyone. **Sisk:** B***** give me your location. Now. **Sisk:** Showing everyone. **Layher:** Davey stop trying to fuck my life up because I don't wanna ruin my daughters. **Sisk:** K bet I'll show everyone. | 7/24/23 | Page 944 |
|---|---|---|---|

| Layher Telegram Messages | **Layher:** Like I love you unconditionally. **Sisk:** Nudes. **Layher:** I'm driving. **Sisk:** Where. **Layher:** Picking something up for my classroom and then to my house. **Sisk:** Nudes. Or I am going to f*** some b*****. | 11/15/23 | Page 2141 |
|---|---|---|---|

| Layher Telegram Messages | **Sisk:** Either you help me or I'll cut you off for good. Dude I am done. Don't text me again. | 1/10/24 | Page 2651 |
|---|---|---|---|

11 ████████████████████████████████████████████████

None of this is offered to excuse what Ms. Layher did.   Ultimately, Ms. Layher acted of her own volition.  She knows she should have maintained her resistance to Mr. Sisk's insistent demands rather than succumb to them.   *See* Letter from Anna Layher.  Importantly, however, there is nothing to suggest she would have made the same decisions regarding her children had she not been involved with Mr. Sisk. Indeed, there is nothing in her social background to suggest a particular sexual predilection toward children.   Rich Report at 3.  The messages between Ms. Layher and Mr. Sisk do not suggest she is deriving enjoyment or satisfaction from her conduct.   Nor, does her limited criminal history reveal similar prior convictions. As such, there is nothing in the record or about her background that suggests that Ms. Layher will repeat her offense.

While nothing can undo the trauma that Ms. Layher has caused her children, her acceptance of responsibility for her actions and her heartfelt remorse are indicative of someone committed to addressing the harm caused and making amends.



*C.  The proposed sentence would be sufficient to promote the goals of sentencing.*

A sentence of fifteen years is significant.  Further, it is exponentially longer than any prior sentence Ms. Layher has ever received. A sentence that includes such a significant term of imprisonment will reflect, and be sufficient to convey to Ms. Layher, and anyone else paying attention, the seriousness of contact with minors for the purpose of producing child pornography. Moreover, this Court's determination about the amount of time she will serve will not be the final one; Ms. Layher is facing a pending prosecution in Fauquier County on related charges.  As a result, Ms. Layher faces the possibility of a significant sentence even after the one imposed by this Court.

Further, Ms. Layher will be on supervision for a period of time beyond service of her sentence.  While on supervision, she will be required to participate in sex offender treatment for as long as United States Probation deems it necessary, and she will also have access to other mental health treatment.  In addition to providing treatment and rehabilitation, a lengthy term of supervision will serve as punishment. *See Gall v. United States*, 552 U.S. 38, 48-49 (2007) (emphasizing that supervision is punishment because it means that the person "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. . . . must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony," and more).

Additionally, Ms. Layher will surely be required to register as a sex offender for at least 25 years.[12]  She also will have exceedingly limited access to minors, and she will not be able to use a computer without Probation knowing how she is using it, as she will be subject to computer monitoring.[13]

This sentence will amply protect the public. Ms. Layher will be completely incapacitated for at least 15 years (less credit for good time), and essentially incapacitated through federal probation officers' monitoring and intense supervision thereafter. Further, Ms. Layher will be approximately 40 when she is released, and older offenders are substantially less likely to recidivate following release.[14]

There is little evidence that a longer sentence will do more to deter future offending more than a 15-year sentence. To the contrary, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[15] Therefore, there is little empirical support for the notion that a

---

[12] *See* 24 U.S.C. § 20911, 20915 (requiring those convicted of felonies involving "production . . . of child pornography" to register for 25 years).

[13] *See* PSR at 23-26 (special conditions proposed by Probation).

[14] U.S. Sent. Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (December 2017), *available at* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (last visited April 9, 2023), at 3.

[15] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); see also National Institute of Justice, *Five Things about Deterrence*, at 1 (May 2016), available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a

sentence longer than that proposed – let alone the 60 years the government proposes – will be any more effective at deterring Ms. Layher, or others, from committing this offense or similar offenses.

Accordingly, the proposed sentence will be sufficient to accomplish the purposes of sentencing. Further, the proposed sentence will best promote "the need to provide restitution to any victims of the offense," as it will preserve years during which Ms. Layher can be expected to work and earn some income to contribute toward restitution. *See* 18 U.S.C. § 3553(a)(6).

   *D. A variance like that proposed would not produce unwarranted disparity.*

A review of sentences imposed in child pornography production cases in this District supports the sentence requested here. Courts have imposed sentences at or near the fifteen-year mark in cases with similar conduct. Consider, for example, the following cases:

   • In *United States v. Manring*, 1:13-cr-13 (CMH), the Court imposed a sentence of 14 years (168 months), followed by 3 years of supervised release, upon a 54-year-old defendant who had filmed himself

---

vastly more powerful deterrent than the punishment"); Ellen Raaijmakers et al., *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Research in Crime and Delinquency 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

performing sexual acts on his own students, who were roughly 5 years old, over a 3-year period in the late 1990s;

· In *United States v. Carl Sara*, 1:17-cr-54 (AJT), the Court imposed a sentence of 14 years (168 months), followed by a lifetime of supervised release, upon a 63-year-old defendant who participated in contemporaneous instant message chatting and webcam live-streaming with adults in Philippines, including in which the adults purported to cause minors to engage in sexually explicit conduct, who negotiated over the internet to have sex with an 8-year-old minor in the Philippines and engaged in chats with the minor, who traveled to the Philippines three months later, who met this 8-year-old on that trip, and who, according to the government, did engage in commercial sex with at least one 16 year-old minor in the Philippines during that trip;

· In *United States v. Kolhoff*, 1:21-cr-158 (LMB), the Court imposed a sentence of 15 years (180 months), followed by 15 years of supervised release, after a bench trial, on a 22-year-old defendant who distributed sexually explicit photographs of her infant child and engaged in graphic conversations;

· In *United States v. Friedel*, 1:14-cr-383 (TSE), the Court imposed a sentence of 16 years (192 months), followed by 10 years of supervised release, upon a 29 year-old defendant who had enticed at least 5 minors to take and send him sexually explicit images of themselves, including one whom he enticed to actually have sex with him (events that he recorded in videos and images), one to whom he distributed other child pornography, and multiple of whom he threatened with exposure, jail, and parental abandonment if they did not cooperate with his demands;

· In *United States v. Velasquez*, 1:13-cr-89 (AJT), the Court imposed a sentence of 16 years (192 months), followed by 10 years of supervised release, upon a 25 year-old defendant who blackmailed a minor into stripping and masturbating online over a webcam so that he could make video recordings of her, who had convinced other minors to engage in sexually explicit conduct on webcams so that he could produce child pornography, who had actually traveled to see at least one minor he enticed online, who had been convicted of sexual intercourse with a child 16 years or older in Wisconsin just seven years before his federal offense, who fled the jurisdiction after being released pretrial, and who admitted to having gotten back on-line while a fugitive;

19

- In *United States v. Collins*, 1:14-cr-26 (CMH), the Court imposed a sentence of 17 ½ years (210 months), followed by 5 years of supervised release, on a 45 year-old defendant who had recorded videos of himself engaged in sexual activity with his 11 year-old niece; and

- In *United States v. Taylor,* 1:12-cr-134 (AJT), the Court imposed a sentence of 18 years (220 months), followed by 15 years of supervised release for father who captured images of his daughter for two years, while she was aged 12 to 14, ultimately including videos of her engaged in sex acts with him, including on occasions when he supplied her with alcohol, marijuana, and Vicodin.

Meanwhile, the government's requested sentence would create a disparity as it greatly exceeds that which has been imposed in the even the most aggravated cases in this district,[16] and it would create disparity between the anticipated sentence of Ms. Layher's co-defendant, Mr. Sisk.   Mr. Sisk, set to be sentenced on October 21, 2024, in the Western District of Virginia, pleaded guilty to two counts of production of child pornography and one count of receipt of child pornography. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed that Mr. Sisk *shall* be sentenced to 20-40 years.  As detailed above and in the PSR, Mr. Sisk directed and led the criminal conduct, which makes it far more egregious than Ms. Layher's.  The government's request for a sentence of 60 years in this case- 150% greater than the high-end of the

---

[16] See, e.g., *United States v. Woolverton*, 1:10-cr-14 (CMH)(sentencing defendant, who produced tens of thousands of images of child pornography, including images of himself engaging in sexual conduct with an infant, to 27 years of incarceration), *United States v. Ricks*, 1:11-cr-105 (JCC)(sentencing defendant, who provided alcohol to his victims in order to abuse them and whose charged offenses spanned 15 years, to 25 years of incarceration), *United States v. Hinawi*, 1:05-cr-361(CMH)(sentencing defendant, with prior convictions for sexual contact with minors, who repeatedly had sex with minor relatives, to 25 years of incarceration).

agreed upon and binding range in the Sisk case- certainly is out of proportion when considered alongside Mr. Sisk's case and the aforementioned comparison cases. And, given this context, a variance in the range of what the defense has proposed will not reflect unwarranted disparity.

## IV. The Court should impose no more than $200 in special assessments.

Ms. Layher objects to the imposition of the $5000 special assessments contemplated by 18 U.S.C. § 3014(a). As the statute states, this is not to be assessed on "indigent" persons. Ms. Layher qualified for appointment of counsel, and the PSR correctly states that her assets are limited, she is unemployed, and she may have restitution obligations. All of that, and the fact that she will serve at least 15 years in prison, leads to the conclusion that Ms. Layher does not have the ability to pay a punitive fine or a fine to cover any other costs. Moreover, although she may be employable in the future, she is not likely to be able to earn enough to cover any further assessments. Further, meeting her anticipated restitution obligations, which must be the priority pursuant to § 3014(f), are sure to leave her with very little, if any, excess income.

The Court should also not impose the special assessments contemplated by 18 U.S.C. § 2259A. That statute provides that the Court must consider the factors in sections 3553 and 3572 when determining the among of this assessment. See § 2259A(c). Here, the amount should be zero because, again, Ms. Layher is indigent, and will most likely remain indigent when she is released. Further, imposing these assessments would only limit Ms. Layher's ability to pay restitution to identified

victims in this case. *See United States v. Sanders*, No. 3:21CR-80-RGJ, 2022 WL 1493858, at *2 (W.D. Ky. May 11, 2022) (imposing no assessment pursuant to § 2259A due to finding that defendant will be unable to pay a fine or special assessment, and because "restitution is more important in this case than the imposition of a fine"); *United States v. Hyatt*, 572 F. Supp. 3d 576, 586 (N.D. Ind. 2021), overruled on other grounds, 28 F.4th 776 (7th Cir. 2022) (finding that imposition of an assessment pursuant to § 2259A would impair defendant's ability to pay restitution).

## CONCLUSION

For these reasons, and such others as may be advanced at the upcoming sentencing hearing, the defense respectfully requests that the Court  impose no more than 15 years of incarceration followed by a period of supervised release and impose no more than $200 in special assessments.[17]

Respectfully submitted on August 29, 2024.

**ANNA GRACE LAYHER**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Brooke S. Rupert, 79729
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880

---

[17] The defense has no objection to allowing 60 days for the resolution of restitution matters, as the government proposes. Gov't Position, ECF No. 31, at 5.

brooke_rupert@fd.org